## COLLINS *v.* THE STATE.

GILBERT, J. The newly discovered evidence is purely impeaching in character, and affords no legal reason for the grant of a new trial. The remaining grounds of the motion for new trial are without merit. The verdict is supported by evidence.

*Judgment affirmed. All the Justices concur, except*
ATKINSON, J., who dissents on the ground that the evidence is insufficient to support the verdict.

No. 2464. APRIL 14, 1921.

Indictment for murder. Before Judge Sheppard. Tattnall superior court. January 14, 1921.

The accused, Needham Collins, was convicted of killing his wife, and was sentenced to life imprisonment. The evidence was in substance as follows: The accused and his wife lived alone. Early in the morning a neighbor, who was working about three hundred yards distant from the house of the accused, heard a noise as of some one crying. He was not quite sure from what point the noise came, as there were other nearby residences. He went to the house of the accused, however, and from the outside called to the accused. The latter came out, seeming to be calm, and nothing unusual ap-

pearing. Immediately after the conversation, as the witness turned away he heard a cry from within the house, which he described as if the person said, " Oh, Needham, you are killing me," or " my head is killing me," witness did not know which. The accused returned to the house and went into the kitchen for the purpose of cooking breakfast. The witness returned to his work. In a short while the witness was informed by another person that the wife of the accused was dead. The evidence of this witness, together with that of several others, shows that the alarm was given, and as these witnesses reached the house of the accused he made to all of them, as well as to the coroner's jury which assembled that night, substantially the following explanation: that the deceased had been sick during the night, and the accused had been up with her rubbing her neck and breast with salve; that about daybreak Ben Rewis, the witness above referred to, came to his home and called him out; that during a short conversation with Rewis the deceased called the accused, and he stated to Rewis that he would have to go and put a fire in the stove, that his wife was unable to prepare breakfast, and he would have to do so; that after making the fire he went out a short distance from the house, to build a hog-pen while the stove was getting hot; that when it was practically completed he returned to the house, bringing an old worn-out ax, the eye badly battered and the handle broken. On entering the house he threw the ax down and it lay about two feet from the house near the steps, and as he did so his wife came out of the house on to the porch, which was about two or three feet from the ground; that she fainted, losing consciousness, fell from the porch, her head striking the ax, which lay on the ground; that accused immediately rushed to her side, picked her up, carried her into the house and placed her on the bed, and gave alarm to a neighbor. Upon arrival of the first neighbor the deceased was found on the bed with a wound on the side of her head. She lived only a few moments, and made no statement of any kind. The wound on the side of the head was the only one, and this was not deep enough to fracture the skull. There was a little blood on the bed and pillow, but none elsewhere, either on the floor or on the ground around where the ax lay. There was no evidence of dirt or sand on the floor or bed, though the witnesses admitted that they had not examined carefully for it. Dr. Hughes, the physician who examined the deceased and testified at the inquest, swore

that " if the dead woman fell from the edge of the porch upon the eye of an ax there, I don't think the blow would have been sufficient to kill her." It was the theory of the State that the accused killed his wife by striking her with an iron poker which was usually kept by the fireplace in the room were the woman was lying. In regard to the possibility of this theory the same witness testified: " That poker could produce death. I don't know whether it would or not. . . I said it was possible for it to do that, but I don't think it probable. . . Death might be produced by taking that and striking one across the head and causing a concussion, or contusion of the brain inside without breaking or cracking or opening the skull. It would not be necessary to break the skull to do it. I made no examination to see whether there was a concussion or contusion of the brain. I did not in any way open the skull." The wound described caused the death of the deceased. Mrs. Williams, a sister of the deceased, testified that about a month before the death of Mrs. Collins the accused told her " that he had whipped her [the deceased], and if that did not do any good he was going to knock hell out of her." Mrs. Jariel testified for the State, that, in addition to the wound already mentioned, she saw three scratches about an inch long on the neck, which looked like finger-nail signs; that the hide was broken; that she did not call the attention of any one else to them, but any one could have seen them; and that she saw the iron poker lying with one end under the ashes. Hub Jariel, for the State, testified to a conversation had with the accused something like a month before the death of Mrs. Collins, in which the accused said " he wished he was single and had an automobile to drive when he wanted to like I did, and allowed he would have a good time." Several of the witnesses swore that they saw no signs around the ax indicating that a human being had fallen, but several swore that they saw the prints of a man's shoe near the ax in the sand; and that the ground around the ax, except a small portion of sand, was covered with weeds and grass. Other witnesses testified that they saw no footprints or tracks in the sand. The defendant made a statement on the trial, in accord with that made to the witnesses as above given. The jury returned a verdict finding him guilty, and recommending life imprisonment. He excepted to the overruling of his motion for a new trial.

28

*Elders & DeLoach* and *Hines, Hardwick & Jordan,* for plaintiff in error.

*R. A. Denny,* attorney-general, *J. Saxlon Daniel,* solicitor-general, and *Graham Wright,* contra.